**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSLYVANIA**

| | | |
|---|---|---|
| RAYMOND GOLD,  individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | |
| RAYMOND J. DE HONT, MICHAEL J. MORRIS, JUDITH A. SPIRES, STANLEY W. SILVERMAN, GEORGE H. GLATFELTER II, and ROBIN L. WIESSMANN,  MET-PRO CORPORATION, | ) ) ) ) ) ) | **JURY TRIAL REQUESTED** |
| and | ) ) | |
| MET-PRO CORPORATION, a Pennsylvania corporation, Nominal Defendant. | ) ) ) ) | |

**SHAREHOLDER CLASS AND DERIVATIVE ACTION COMPLAINT**

Plaintiff Raymond Gold ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

**NATURE OF THE ACTION**

1.       As a shareholder of Met-Pro Corporation ("Met-Pro" or the "Company"), Plaintiff brings this shareholder class and derivative action on behalf of the public common stockholders of Met-Pro and Met-Pro seeking equitable relief for the breach of fiduciary duties by the Met-Pro Board of Directors (the "Board" or the "Individual Defendants") arising out of their ongoing efforts to sell the Company to CECO Environmental Corp. ("CECO") (the "Proposed Transaction") pursuant to an unfair price, an unfair process, and through a materially misleading

recommendation statement.   In addition, Plaintiff brings a claim on behalf of himself and the Class against Defendants for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.     Met-Pro manufactures and sells fluid handling equipment, product recovery and pollution control equipment, and filtration products. The Company markets and sells its products through its own personnel, distributors, representatives, and agents worldwide. Met-Pro was founded in 1966 and is headquartered in Harleysville, Pennsylvania.

3.     On April 22, 2013, CECO and the Company announced a definitive merger agreement under which CECO, through its wholly owned subsidiaries Mustang Acquisition Inc. ("Merger Sub I") and Mustang Acquisition II Inc. ("Merger Sub II"), will acquire all of the outstanding shares of Met-Pro in a cash and stock transaction (the "Proposed Transaction"). The Proposed Transaction consideration includes $7.25 per share in cash and $6.50 per share in CECO common stock. Pursuant to the terms of the Proposed Transaction, Met-Pro's shareholders may elect to exchange each share of Met-Pro common stock for either $13.75 in cash and/or shares of CECO common stock.  Overall elections are subject to proration such that approximately 53% of the Met-Pro shares will be exchanged for cash and 47% for stock. The Proposed Transaction is valued at a total of approximately $210 million.

4.     The Board has breached their fiduciary duties by agreeing to the Proposed Transaction for grossly inadequate consideration. As described in more detail below, the consideration shareholders are to receive is inadequate and significantly undervalues the Company.

5.      The Proposed Transaction is the result of a non-existent sales process in which the Board negotiated solely with CECO, and decided against running any semblance of a market check. Additionally, the Board failed to properly oversee these discussions, allowing Raymond J. De Hont ("De Hont"), the Company's Chief Executive Officer ("CEO") to effectively run negotiations with CECO despite the fact that De Hont and certain of the Company's other executive officers, will have continued employment in the post transaction Company.

6.      The Company's officers and directors also stand to gain other unique benefits from the Proposed Transaction. All unvested stock options and restricted stock units currently held by the Company's officers and directors will automatically vest upon consummation of the Proposed Transaction. Additionally, in the event that they do not receive continued employment in the post-transaction Company, several of the Company's executive officers will receive lucrative severance payments in connection with the Proposed Transaction.

7.      Moreover, Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company.  Specifically, pursuant to the merger agreement dated April 21, 2013 (the "Merger Agreement"), defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirors or even in continuing discussions and negotiations with potential acquirors; and (ii) a provision that requires the Company to pay CECO a termination fee of $6.74 million in order to enter into a transaction with a superior bidder.  These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives including a sale of all or part of Met-Pro.

8.      In addition, on May 23, 2013, the Company filed an S-4 Registration Statement with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction, which was amended on July 3, 2013 through a filing of an S-4/A (the "Registration Statement"). The Registration Statement fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision as to how to vote at the special shareholder meeting. Defendants have violated Section 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, and the Board has breached its fiduciary duty of candor by omitting material facts necessary to render the Registration Statement non-misleading.

9.      The Individual Defendants have breached their fiduciary duties of loyalty, due care, independence, good faith and fair dealing, and Met-Pro, CECO, Merger Sub I and Merger Sub II have aided and abetted such breaches by Met-Pro's officers and directors. Plaintiff seeks to enjoin the Proposed Transaction unless and/or until defendants cure their breaches of fiduciary duty.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Section 14(a) and 20(a) of the Exchange Act and Rule 14a-9. This Court further has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs. Plaintiff is a citizen of California and no Defendant is a citizen of California.

11.     This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

12.     Venue is proper in this district because a substantial portion of the transactions and wrongs alleged herein occurred in this district. Furthermore, the Company is headquartered in this district.

## PARTIES

13.     Plaintiff is and has been at all relevant times, the owner of shares of Met-Pro's common stock. Plaintiff is a citizen of California.

14.     Met-Pro is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.   It maintains its principal corporate offices at 160 Cassell Road, Harleysville, Pennsylvania 19438. Met-Pro is named as a defendant solely for the purpose of providing full and complete relief.

15.     Defendant De Hont has been the President and Chief Executive Officer of the Company since March 2003, and a director of the Company since February 2003. De Hont also served as the Chairman of the Board from September 2003 until November 2012. De Hont is a citizen of Pennsylvania.

16.     Defendant Michael J. Morris ("Morris") has been a director of the Company since August 1999. Morris is a citizen of Pennsylvania.

17.     Defendant Judith A. Spires ("Spires") has been a director of the Company since January 2009. Spires is a citizen of New Jersey.

18.     Defendant Stanley W. Silverman ("Silverman") has been a director of the Company since September 2009. Silverman is a citizen of Pennsylvania.

19.     Defendant George H. Glatfelter II ("Glatfelter") has been a director of the Company since May 2004. Glatfelter is a citizen of Pennsylvania.

20.     Defendant Robin L. Wiessmann ("Wiessmann") has been a director of the Company since December 2009. Weissmann is a citizen of New York.

21.     Defendants De Hont, Morris, Spires, Silverman, Glatfelter, and Wiessmann are collectively referred to as Individual Defendants and/or the Board.

## CLASS ACTION ALLEGATIONS

22.     Plaintiffs bring this action on its own behalf and as a class action on behalf of all owners of Met-Pro common stock and their successors in interest, except Defendants and their affiliates (the "Class").

23.     This action is properly maintainable as a class action for the following reasons:

(a)     the Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, as of April 12, 2013, 14,696,855 shares of common stock were represented by the Company as outstanding.

(b)     questions of law and fact are common to the Class, including, inter alia, the following:

(i)     Have the Individual Defendants breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiffs, the Company, and the other members of the Class in connection with the Proposed Transaction;

(ii)     Have the defendants breached any of their other fiduciary duties to plaintiffs, the Company, and the other members of the Class in

connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

(iii)    Whether the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and the other members of the Class;

(iv)    Have the defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(v)    Whether plaintiffs and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

(vi)    Have Met-Pro, Merger Sub I, Merger Sub II and CECO aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(vii)    Is the Class entitled to injunctive relief or damages as a result of defendants' wrongful conduct.

(c)    Plaintiffs are committed to prosecuting this action, are adequate representatives of the Class, and have retained competent counsel experienced in litigation of this nature.

(d)    Plaintiffs' claims are typical of those of the other members of the Class.

(e)    Plaintiffs have no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)     Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy

## DERIVATIVE ALLEGATIONS AND
## DEMAND PURSUANT TO PENNSYLVANIA LAW

24.     Plaintiffs also bring this action derivatively in the right and for the benefit of Met-Pro to redress injuries suffered, and to be suffered, by Met-Pro as a direct result of breaches of fiduciary duty by the Individual Defendants.  As to the derivative claims, Met-Pro is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

25.     Pursuant to Pennsylvania law, in a letter dated May 1, 2013 Plaintiff made a demand upon the current Met-Pro Board of Directors, as required, describing (i) the factual basis for the allegations of wrongdoing, (ii) how such wrongdoing is harmful to the Company, and (iii) requesting that the Board take remedial action, including without limitation, ensuring that the Proposed Transaction's consideration is fair to Met-Pro and its shareholders.

26.     In addition, pursuant to Commonwealth law, demand is excused because such a demand would be a futile and useless act that would lead to Met-Pro suffering irreparable injury, particularly for the following reasons:

(a)     Each of the Individual Defendants knew of and/or directly benefited from the wrongdoing complained of herein;

(b)     Each member of the Board has been named as a defendant to this lawsuit;

(c)     In order to bring this suit, all of the directors of Met-Pro would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(d)     The acts complained of constitute violations of the fiduciary duties owed by Met-Pro's officers and directors and these acts are incapable of ratification;

(e)     Any suit by the directors of Met-Pro to remedy these wrongs would likely expose the Individual Defendants and Met-Pro to further civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(f)     Each member of the Met-Pro Board is, directly or indirectly, the recipient of remuneration paid by the Company, by virtue of their Board membership, the continuation of which is dependent upon their cooperation with the other members of the Board, and their participation and acquiescence in the wrongdoing set forth herein, and is therefore incapable of exercising independent objective judgment in deciding whether to bring this action;

(g)     Because of their association as directors of the Company, the directors are dominated and controlled so as not to be capable of exercising independent objective judgment; and

(h)     The Company's directors' and officers' liability insurance coverage prohibits directors from bringing suits against each other.  Thus, if the Individual Defendants caused the Company to sue its officers and directors for the liability asserted in this case, they

would not be insured for that liability. This they will not do. The Company's officers' and directors' liability insurance was purchased and paid for with corporate funds for the protection of the corporation. This derivative action does not trigger the "insured vs. insured" exclusion, and therefore only this derivative action can obtain a recovery from the Company's officers' and directors' insurance for the benefit of the corporation.

27.     The Company's directors and executive officers have material conflicts of interest and are acting to better their own personal interests through the Proposed Transaction at the expense of Met-Pro's public shareholders.

28.     The Company's CEO, De Hont, has procured a position as Chief Operating Officer in the post-transaction Company, while Neal Murphy ("Murphy"), the Company's finance chief, will assume the position of Chief Financial Officer in the post-transaction Company.

29.     Additionally, all unvested stock options and restricted stock units held by the Company's officers and directors will automatically vest upon consummation of the Proposed Transaction. Although the Registration Statement fails to disclose the value of the restricted stock units held by each director, the aggregate value of these restricted stock units is $979,993. The consideration to be received by the Company's executive officers through their stock option holdings is detailed in the chart below:

| Executive Officer | Stock Option Consideration ($) |
|---|---|
| Raymond De Hont | 1,617,512 |
| Neal Murphy | 191,984 |
| Gennaro A. D'Alterio | 179,800 |
| Gregory C. Kimmer | 298,194 |
| Paul A. Tetley | 426,504 |
| Gary Morgan | 521,055 |

30.     Additionally, those executive officers who have not procured themselves employment in the post-transaction Company will receive lucrative severance payments. Vice Presidents Gennaro A. D'Alterio, Gregory C. Kimmer, and Paul A. Tetley will receive Golden Parachute Compensation totaling $299,514, $411,149 and $664,319, respectively, in the event their employment is terminated in connection with the Proposed Transaction.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**Company Background and Success**

31.     Met-Pro manufactures and sells fluid handling equipment, product recovery and pollution control equipment, and filtration products. Its Product Recovery/Pollution Control Technologies segment provides solutions and products for the purification of air and liquids in a variety of industries. The company's Fluid Handling Technologies segment manufactures horizontal, vertical, and in-tank centrifugal pumps for the pumping of acids, brines, caustics, bleaches, seawater, waste liquids, and high temperature liquids used in industrial and commercial applications.   The company markets and sells its products through its own personnel, distributors, representatives, and agents worldwide.

32.     The Company has seen tremendous growth and success in recent years. The Company experienced improvements in various financial metrics and an impressive number of new orders during the fiscal year ended January 31, 2012. Net sales for the fiscal year ended January 31, 2012 increased 13% to $100.2 million compared with $88.9 million for the same period last year. Meanwhile, net income totaled $7.1 million and diluted earnings per share were $0.48 for the fiscal year ended January 31, 2012 compared with net income of $6.1 million and diluted earnings per share of $0.42 for the same period during the prior year, increases of 16% and 14%, respectively. Additionally, new orders for the fiscal year

ended January 31, 2012 were up 23% to $110.9 million compared with $89.9 million for the prior fiscal year.

33.     Speaking of this growth and the Company's successful implementation of expansion strategies, De Hont described the Company's strength and favorable positioning going forward in a March 22, 2012 press release:

> We are pleased to announce strong earnings, revenues and new orders for the current quarter and for the full fiscal year. "Our continuing investments to bolster global organic growth and our ongoing strategic focus on providing engineered solutions across the markets we serve continue to gain traction resulting in solid top line and bottom line growth. New orders over the past year, which included bookings in South America, Russia, Singapore and China, offer clear evidence of our expanding international growth. With our strong balance sheet, expanding global presence and commitment to executing our global solutions strategy, we are well positioned to continue to deliver attractive returns to our shareholders.

34.     This success continued in the Company's first quarter ended April 30, 2012. Net sales for the quarter were $25.2 million—the highest first quarter net sales in the Company's history, as well as a 7.6% increase from $23.4 million for the same quarter in the prior year. Additionally, bookings in the quarter were up 5.8% to $27 million compared with $25.5 million for the same quarter in the prior year.

35.     The Company's financial report for the second quarter ended July 31, 2012 produced similar results. Net sales for the second quarter ended July 31, 2012 were $28.0 million, an increase of 21% compared with net sales of $23.1 million for the same quarter in the prior year. Net income for the second quarter ended July 31, 2012 was $1.6 million, or $0.11 per diluted share, compared with net income of $1.5 million, or $0.10 per diluted share, for the same period in the prior year. New orders for the second quarter were $31.5 million, a 7% increase when compared with $29.5 million for the second quarter in the previous year. Lauding the Met-

Pro's continued success in a September 6, 2012 press release, De Hont again confirmed the Company's bright future, stating:

> The significant increase in revenues and growth in bookings and backlog in the quarter are strong indicators that our marketing strategy has been effective in increasing share in our targeted end markets. Each of our business segments contributed to the strong top line growth, with three of our business segments generating operating profits that led to a 10% increase in earnings in the quarter compared with the same period a year ago. . . . We are encouraged by our success penetrating new markets and expanding our customer base. By continuing to strengthen our organization, we will be able to more effectively leverage this increasing market success to improve returns. The strong interest in our products, together with our solid backlog, allows us to remain optimistic about our future prospects.

36.    The Company's third quarter ended October 31, 2012 results were in line with De Hont's predictions of continued growth. Net sales for the third quarter ended October 31, 2012 were $29.8 million, an increase of 18% compared with net sales of $25.2 million for the same quarter in the previous year. Net income was $2.8 million or $0.19 per diluted share, increases of 34% and 36%, respectively, when compared with net income of $2.1 million or $0.14 per diluted share for the third quarter of the previous year.

37.    Additionally, in a March 21, 2013 press release the Company announced that it had achieved record net sales of $109.9 million, up 10% from $100.2 million from the prior year, for the fiscal year ended January 31, 2013. Additionally, Net income for fiscal 2013 totaled $8.0 million, or $0.55 per share, increases of 13% and 15%, respectively, compared with net income of $7.1 million, or $0.48 per share, for fiscal 2012. Moreover, on March 15, 2013, shareholders received a quarterly dividend of $0.0725 per share, marking the twenty-second consecutive year that Met-Pro has paid a cash dividend. Speaking of these results, as well as the stability of the Company's growth, De Hont stated:

> The global strength of the Met-Pro brands and a more strategic sales and marketing effort enabled us to improve our penetration of targeted growth

markets and increase net sales at a double-digit rate to record levels in fiscal 2013. Fiscal year earnings increased for the third consecutive year, as our sales and marketing strategy together with the productivity and efficiency enhancements implemented within our organization continued to gradually translate into improved overall financial performance. . . . We are pleased with the fiscal 2013 results and the progress we have made in improving our overall financial performance. Our pipeline of potential opportunities allows us to remain optimistic regarding our full year fiscal 2014 prospects.

38.    Most recently, on May 8, 2013 the Company announced its first quarter financial results, revealing increases in net sales, net income and bookings, along with striking increases in gross profit and gross margin. Gross profit increased by 9.8%, to $11.2 million as compared to $10.2 million in 2012, while gross margin increased to 32.6% compared to 30.9% for the same quarter in 2012.

39.    The Company's strong performance has not gone unnoticed by analysts. Met-Pro was featured in an October 31, 2012 *seekingalpha.com* article entitled "4 Cash-Loaded Dividend Stocks Set For Growth," as well as an April 18, 2013 *seekingalpha.com* article entitled "10 Good-Yielding Dividend Stocks To Beat The Market."

**The Proposed Transaction is Unfair**

40.    In a press release dated April 22, 2013, the Company announced that it had entered into a merger agreement with CECO pursuant to which CECO, through Merger Sub I and Merger Sub II, will acquire all of the outstanding shares of the Company in a cash and stock transaction. The Proposed Transaction consideration includes $7.25 per share in cash and $6.50 per share in CECO common stock. Pursuant to the terms of the Proposed Transaction, Met-Pro's shareholders may elect to exchange each share of Met-Pro common stock for either $13.75 in cash and/or shares of CECO common stock.  Overall elections are subject to proration such that approximately 53% of the Met-Pro shares will be exchanged for cash and 47% for stock. The Proposed Transaction is valued at a total of approximately $210 million.

41.     Given the Company's recent strong performance, the Proposed Transaction consideration is inadequate and significantly undervalues the Company.

42.     The financial analyses performed by CECO's financial advisor in connection with the Proposed Transaction, indicate that the Board has failed to procure adequate consideration for shareholders. Jefferies LLC's ("Jefferies") *Discounted Cash Flow Analysis* depicts an implied per share equity value range of the Company's stock with a high of $15.26, while its *Premiums Paid Analysis* depicts an implied per share equity value range of the Company's stock with a high of $15.13.

43.     Indeed, even the financial analyses performed by the Company's financial advisor in connection with the Proposed Transaction, indicate that the Board has failed to procure adequate consideration for shareholders. William Blair & Company, L.L.C's ("William Blair") *Discounted Cash Flow Analysis* depicts an implied per share equity value range of the Company's stock with a high of $17.06.

44.     CECO is seeking to acquire the Company at the most opportune time, at a time when the Company is performing very well and is positioned for tremendous growth.

**The Non-Existent Sales Process**

45.     Additionally, the Proposed Transaction is the result of a non-existent sales process in which the Board solely focused their efforts on reaching a deal with CECO rather than on reaching a deal which maximized shareholder value.

46.     The Proposed Transaction is the result of discussions between CECO and Company management that stem back to 2010. After ceasing negotiations in November 2010, CECO resumed them once more in March 2012 when Phillip DeZwirek ("DeZwirek"), CECO's then Chairman of the Board, contacted De Hont.

47.    At no point did the Board make any efforts to solicit other interested parties or perform any semblance of a market check. Indeed, on January 3, 2013, the Board expressly declined making any such efforts to run a sales process to determine the market's valuation of the Company, expressing fears at the impact such action may have on its ongoing negotiations with CECO.

48.    Neither did the Board make any efforts to curtail management's discretion and power in its discussions with CECO; discussions that were largely dominated by De Hont and Murphy. No efforts were made to oversee management's negotiations through the formation of a special committee, or restrictions on management's ability to discuss post-transaction employment while negotiating offer price and other material terms of a transaction—this remained true even after January 3, 2013 when "it was the Board's expectation that a majority of Met-Pro's employees would continue employment with CECO after the closing." Unsurprisingly, the same day the Proposed Transaction was announced, it was also announced that De Hont and Murphy had procured employment for themselves in the post-transaction company.

49.    As such, the Board chose to disregard shareholder interest, focusing on reaching a deal with CECO, and allowing management to focus these discussions on its own interest, rather than on engaging in a sales process in pursuit of a transaction that would maximize shareholder value.

**The Unduly Restrictive Deal Protection Devices**

50.    The Proposed Transaction is also unfair because as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate

conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing

offers will emerge for the Company.

51.     The Merger Agreement contains a strict "no shop" provision that prohibits the

Board from taking any meaningful action to ensure that they are in compliance with their

fiduciary duties, including solicitation of alternative acquisition proposals or business

combinations.

52.     Specifically, § 6.2 of the Merger Agreement includes a "no solicitation" provision

barring the Company from soliciting interest from other potential acquirers in order to procure a

price in excess of the amount offered by CECO. Section 6.2(a) demands that the Company

terminate any and all prior or on-going discussions with other potential acquirers.

53.     The Merger Agreement also contains a "matching rights" provision, whereby the

Company must promptly notify CECO should it receive an unsolicited competing acquisition

proposal. Pursuant to § 6.2(d) of the Merger Agreement, the Company must notify CECO of the

bidder's identity and the terms of the bidder's offer. Thereafter, if the Board determines that the

competing acquisition proposal constitutes a "Superior Proposal," § 6.2(e)(B)(x) requires the

Board to grant Parent 4 business days to amend the terms of the Merger Agreement to make a

counter-offer that the Company must consider in determining whether the competing bid still

constitutes a "Superior Proposal."

54.     The effect of these provisions is to prevent the Board from entering discussions or

negotiations with other potential purchasers unless the Board can first determine that the

competing acquisition proposal is, in fact, "superior," and even then, the Company must give

CECO 4 business days to match the competing acquisition proposal. This severely limits the

opportunity for a potential purchaser to emerge, and severely limits the ability of the Board from properly exercising their fiduciary duties.

55.     The Merger Agreement also provides that a termination fee of $6.74 million must be paid to CECO by Met-Pro if the Company decides to pursue the competing offer. The substantial termination fee will ensure that no competing offer will appear, as any competing bidder would essentially pay a premium for the right to provide the shareholders with a superior offer.

56.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

**The False and Misleading Registration Statement**

57.     On May 23, 2013, the Company filed the Registration Statement with the SEC in connection with the Proposed Transaction. The Registration Statement fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision as to how to vote at the special shareholder meeting. Defendants have violated Section 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, by omitting material facts necessary to render the Registration Statement non-misleading.

58.     The Registration Statement fails to provide a fair summary of the management prepared financial projections for Met-Pro for the fiscal years 2014 through 2018, which formed the basis of William Blair's financial analysis, including the following items:

     (a)     Unlevered free cash flow;

     (b)     Earnings per share ("EPS");

     (c)     Cost savings and other synergies;

     (d)     Taxes; and

     (e)     Depreciation and amortization

59.     The Registration Statement fails to disclose the management prepared financial projections for CECO for fiscal years 2013 through 2017, which formed the basis of William Blair's financial analysis, including the following items:

     (a)     Unlevered free cash flow;

     (b)     Earnings per share ("EPS");

     (c)     Cost savings and other synergies;

     (d)     Taxes; and

     (e)     Depreciation and amortization

60.     The Registration Statement fails to disclose whether William Blair has performed any services for CECO and Met-Pro during the past two years prior to its opinion concerning the financial fairness of the Proposed Transaction, and if so, the dates, nature and compensation received for any such services.

61.     The Registration Statement fails to disclose the compensation that each director and executive officer will receive as a result of the accelerated vesting of his/her stock awards -- *i.e.*, unvested options and restricted stock units, that will occur upon closing of the Proposed Transaction.

62.    The Registration Statement failed to fairly summarize William Blair's financial analyses, including by failing to disclose the following:

(a)    With respect to the *Met-Pro Contribution Analysis*:

(i)    Met-Pro shareholder's pro forma diluted ownership of the combined company and the effect of the collar provision on their pro forma ownership; and

(ii)    calculations of the enterprise value and equity value of MPR and CECE, respectively, and; the methods utilized in such calculations;

(b)    With respect to the *Selected Public Company Analysis*:

(i)    The objective criteria utilized by William Blair in its selection of companies for each of the three sector groups used in this analysis;

(ii)    The selected companies grouped by the three sectors analyzed – Pollution Control Technologies, Fluid Handling, and Filtration;

(iii)    The multiples observed for each company utilized in the analysis or, at least, the minimum, mean, median, and maximum valuation multiples of each of the three sector groups – this disclosure is particularly important in light of the wide range of observed multiples, the absence of an implied fair range of exchange ratios or an implied per share value for Met-Pro; and

(iv)    The methodology by which the enterprise value and equity value "implied for Met-Pro based on the terms of the Mergers" were calculated – *i.e.*, how was the collar was factored into this analysis, if at all;

(c)    With respect to the *Selected Mergers & Acquisitions Transactions Analysis*:

(i)     The objective criteria utilized by William Blair in its selection of the transactions for each of the three sector groups used in this analysis, *e.g.*, whether the selected targets included only domestic or regional companies;

(ii)    The selected transactions grouped by the three sectors analyzed – Pollution Control Technologies, Fluid Handling, and Filtration;

(iii)   The multiples and target enterprise values observed for each transaction utilized in the in the analysis or, at least, the minimum, mean, median, and maximum valuation multiples of each of the three sector groups – this disclosure is particularly important in light of the wide range of observed multiples, the absence of an implied fair range of exchange ratios or an implied per share value for Met-Pro; and

(iv)    The methodology by which the enterprise value and equity value "implied for Met-Pro based on the terms of the Mergers" were calculated – *i.e.*, how was the collar was factored into this analysis, if at all.

(d)     With respect to the *Discounted Cash Flow Analysis*:

(i)     The assumptions underlying the calculations of the Company's weighted average cost of capital;

(ii)    The basis for the discount rate range of 12.5% to 16.5%;

(iii)   Whether unlevered free cash flow included depreciation and amortization, and if not, the rationale for failing to add back such changes;

(iv)    The unlevered free cash flow projections utilized by William Blair in this analysis, and the source of such projections;

(v)     The basis for the multiples range of 8.0x to 11.0x used in this analysis; and

(vi)    Whether depreciation and amortization were factored into the unlevered free cash flow utilized in the analysis.

(e)     With respect to the *Leveraged Acquisition Analysis*:

(i)     The material assumptions underlying the analysis, including leverage assumptions;

(ii)    The basis for the multiples range of 8.0x to 11.0x used in this analysis; and

(iii)   The basis for the equity IRR (internal rates of return) of 22.5% to 27.5% used in this analysis.

(f)     Any "sum of the parts" analysis performed by William Blair in connection with the Proposed Transaction.

63.     The Registration Statement failed to fairly summarize Jefferies' financial analyses, including by failing to disclose the following:

(a)     With respect to the *Selected Comparable Company Analysis*: the objective criteria used in the selection of companies utilized in the analysis; the multiples observed for each company utilized in the analysis, and the observed multiples for Met-Pro;

(b)     With respect to the *Selected Comparable Transactions Analysis*: the objective criteria used in the selection of transactions utilized in the analysis, and each transaction multiple and target enterprise value observed for each transaction utilized in the analysis;

(c)     With respect to the *Discounted Cash Flow Analysis*: the assumptions underlying the calculations of the Company's weighted average cost of capital;

(d)     With respect to the *Historical Trading Analysis*: the conclusions drawn from this analysis.

64.     The Registration Statement also fails to disclose various material aspects of the sales process. These aspects include:

(a)     The reason for which Met-Pro initially identified CECO as a possible strategic partner in 2010, and whether Met-Pro had identified other possible strategic partners at that time;

(b)     The Board's reasons for determining not to pursue a strategic transaction with CECO on November 5, 2010, other than CECO's unwillingness to enter into a standstill agreement with Met-Pro at that time;

(c)     Whether the Board considered a potential acquisition of CECO at any time in the last 3 years;

(d)     The dates on which De Hont and Murphy's expected employment in the post-transaction company were discussed or negotiated, and whether the Board learned of such negotiations prior to or after such discussions were held;

(e)     Met-Pro's strategic alternatives discussed by the Board and William Blair during the 2012-2013 sale process;

(f)     The criteria used to determine identify "potential purchasers" of Met-Pro on January 3, 2013, and the reasons for which the Board believed that synergies from a potential transaction with these potential buyers would be materially less than those expected from a transaction with CECO;

(g)     The reasons for which the Board expected on January 3, 2013, that a majority of the Company's employees would continue employment with CECO after the closing;

(h)     The method by which the Board determined on February 20, 2013 that $13.75 per share would be an appropriate amount of consideration to be offered to shareholders;

(i)     Whether the Board ever considered the creation of a special committee to oversee management's negotiations, and the reasons for which no such committee was created; and

(j)     The reason for which on April 11, 2013 the Board determined that a broader collar would be a better means to ensure shareholder value.

65.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

66.     Plaintiff repeats all previous allegations as if set forth in full herein.

67.     Defendants have issued the Registration Statement with the intention of soliciting shareholder support of the Proposed Transaction.

68.     Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

69.     Specifically, the Registration Statement violates the Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

70.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff, as well as the Company's other public shareholders, and Plaintiff and other shareholders will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against All Individual Defendants**

71.     Plaintiff repeats all previous allegations as if set forth in full herein.

72.     The Individual Defendants acted as controlling persons of Met-Pro within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Met-Pro and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading

73.     Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

74.     Specifically, the Registration Statement violates the Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

75.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff, as well as the Company's other public shareholders, and Plaintiff and other shareholders will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT III
### For Breach of Fiduciary Duties Against the Individual Defendants Brought Derivatively on Behalf of Met-Pro

76.     Plaintiff repeats all previous allegations as if set forth in full herein.

77.     The Individual Defendants have violated the fiduciary duties of care, loyalty, good faith, and independence owed to the public shareholders of Met-Pro and have acted to put their personal interests ahead of the interests of Met-Pro's shareholders.

78.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value inherent in and arising from Met-Pro.

79.     The Individual Defendants have violated their fiduciary duties by entering Met-Pro into the Merger Agreement without regard to the effect of the Proposed Transaction on Met-Pro's shareholders.

80.     Specifically, the fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose to Plaintiff and the Class all information material to the decisions confronting Met-Pro shareholders.

81.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Met-Pro, Plaintiff and the other members of the Class.  As set forth above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and omissions of material information.

82.     As a result of the Individual Defendants' unlawful actions, Plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of Met-Pro's assets and operations. Unless the Proposed Transaction is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Proposed Transaction terms and may consummate the Proposed Transaction, all to the irreparable harm of the members of the Class.

83.     Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     declaring this action to be a properly maintainable class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B)     declaring that the Recommendation Statement is materially misleading and contains omissions of material fact in violation of Section 14(d)(4) and 14(e) of the Exchange Act;

(C)     enjoining, preliminarily and permanently, the Merger Agreement and the Proposed Transaction unless or until the Company adopts and implements a procedure or process to: (i) obtain the highest possible value in the best interests of Plaintiff and other Met-Pro shareholders, and (ii) provide all material disclosures to Plaintiff and all Met-Pro shareholders with which they are able to make informed decisions about whether to vote their shares in favor of the proposed sale of Met-Pro to CECO;

(D)     in the event that the Proposed Transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(E)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)     granting Plaintiff and the other members of the Class such further equitable relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 8, 2013                BRODSKY & SMITH, LLC

By: _____
Evan J. Smith, Esq.
Jordan A. Schatz, Esq.
2 Bala Plaza, Ste. 602
Bala Cynwyd, PA 19002
Tel: (610) 667-6200
Fax: (610) 667-9029

LEVI & KORSINSKY, LLP

Shannon Hopkins, Esq.
Julia Sun, Esq.
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

*Attorneys for Plaintiff*